**Electronically Filed
Intermediate Court of Appeals
30729
31-AUG-2011
08:57 AM**

NO. 30729

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


IN THE INTEREST OF S.F.
and IN THE INTEREST OF K.F.


APPEAL FROM THE FAMILY COURT OF THE SECOND CIRCUIT
(FC-S Nos. 05-1-0055 and 05-1-0056)


SUMMARY DISPOSITION ORDER
(By:  Nakamura, Chief Judge, Fujise and Leonard, JJ.)

Appellant-Mother (**Mother**) appeals from the Findings of Fact, Conclusions of Law, and Order (**FOF/COL/Order**), filed on August 25, 2010, in the Family Court of the Second Circuit (**Family Court**).[1]/  In the FOF/COL/Order, the Family Court found, *inter alia*, that Mother was not and would not become within a reasonable period of time willing and able to provide her children, S.F. and K.F. (**Children**), with a safe family home, even with the assistance of a service plan, and the Department of Human Service's (**DHS's**) Proposed Permanent Plan dated January 4, 2010 was in Children's best interests.  The court awarded DHS permanent custody of Children.

On appeal, Mother argues that the Family Court wrongly concluded in Conclusions of Law (**COL**) 8 that she was not presently willing and able to provide Children with a safe family

_____

[1]/    The Honorable Geronimo Valdriz, Jr. issued the FOF/COL/Order.

home, even with the assistance of a service plan, for the following reasons:

(1) DHS did not make reasonable efforts to reunite Children with Mother, where DHS did not provide Mother with an adequate written service plan and thereafter, did not issue her a new or updated service plan, which shifted to her the burden of locating and procuring services. Related to this argument is her contention that Findings of Fact (**FOFs**) 62, 77-78, and 79 are clearly erroneous.

(2) DHS did not make reasonable efforts to reunite Children with Mother because DHS did not provide Mother with reasonable visitation. Related to this argument is her contention that FOFs 47 and 79 are clearly erroneous.

Mother asks that we vacate the FOF/COL/Order and remand this case for further proceedings.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's points of error as follows:

(1) In conjunction with her first point of error, Mother argues that the 4/15/08 service plan, which had the ultimate goal of reunifying Child with Mother in a safe home without DHS services, does not provide clear objectives and goals, only vague service recommendations and target dates, in violation of Hawaii Revised Statutes (**HRS**) § 587-26 (Supp. 2006). In addition, Mother maintains that "[t]here is no evidence in the record to demonstrate that any ICPC [Interstate Compact on the Placement of Children] contact ever was provided or that Mother received any help or assistance from the Oklahoma Department of Child Service or the Maui DHS in procuring the services required to meet the Target goals listed in the [plan]." We disagree.

The 4/15/08 plan provides, *inter alia*:

II.  TASKS FOR PARENTS, (PRIORITIZED ACCORDING TO SAFETY NEEDS)

The following tasks are based on the safety issues, as outlined in the [report] dated Jun 30, 2005 and [M]other's stipulation to harm at the court hearing on August 30, 2005.

A.  PARENT:  [Mother]

1.  [Mother] will participate in a substance abuse program as arranged by her probation officer in connection with her felony conviction and the requirements of her sentencing.  She will be required to participate in random urinalysis checks through her program and to build her sober support system.

a.  Focus of task:  To support abstinence

b.  Name and address of provider:  To be determined

c.  Mother will follow all requirement [sic] made by her probation officer and will sign all consents to allow the DHS and GAL to access those records and contact and discuss her case with her provider.

**Expected Changes** Mother will have negative UA tests, and create a safe sober support system, through her counseling and sober contacts.

2.  [Mother] will actively participate in individual parent services.

a.  Focus of task: To increase [M]other's understanding of the developmental needs of her children and the immense harm she has caused them through her irresponsible and dangerous and violent behaviors towards them;

b.  Name and address of provider: To be determined by her probation officer in Oklahoma or through our impending ICPC contact with the Oklahoma Department of Child Services; and

c.  Time frame:  Mother will participate until completion of the parenting program as recommended by the parent educator and the DHS social worker.

**Expected changes**:  Mother will have an enhanced understanding of the needs of the children in terms of their physical, developmental, and emotional needs.

3. [Mother] will participate in individual psychotherapy with both a psychiatrist for medical management and face to face treatment, and either a psychologist or qualified therapist to address her Bi-Polar Disorder coupled with her Personality Disorder. This may be done through a group or individual therapy. It will need to be highly structured and [Mother] will be required to sign any releases necessary so that DHS, the GAL and the therapist treating her children can communicate freely with her therapists and receive reports. DHS will not accept any diagnosis or treatment from Dr. Dan Asimus as he has not seen [Mother] for over a year and relies on only her reports via phone to devise his treatment. She will follow all qualified treatment recommendations.

    a. Focus of task: To assist [Mother] in addressing her mental health issues, such as her inability to control her temper, her paranoid thought processes and her bi-polar disorder with personality disorder;

    b. Name and address of provider: To be determined by her Federal Probation Officer in Oklahoma and if needed by our ICPC contacts in Oklahoma; and

    c. Time frame: She will continue until clinically discharged with DHS approval.

**Expected changes:** Mother will develop coping skills that she can utilize to stabilize her life during times that are stressful. This stability will benefit the children by preventing disruption to their daily activities.

4. [Mother] will fully comply with all other aspects of her probation.

5. Cooperate with the DHS Social Worker by:

    a. Keeping appointments with worker and providers;

    b. Attending other services as recommended;

    c. Informing of any changes in the home;

    d. Informing of any problems in following the service plan; and

    e. Keeping appointments with probation officers and following probation requirements.

(Formatting altered.) As Mother was in Oklahoma, in conjunction with her sentence for a conviction of a charge of interference with a flight attendant (**Interference**) (the incident having occurred after Mother fled the Hawai'i court's jurisdiction with Children, while subject to family supervision), the 4/15/08 plan relied in part, and appropriately, on services provided to Mother in Oklahoma. A 4/8/08 report provides, *inter alia*:

> At this time [Mother] is in Oklahoma. She has been sentenced on her felony plea of [Interference]. She is required to participate in an array of services including psychological counseling, anger management and psychiatric treatment with medical management from the treating psychiatrist. This worker was able to speak with her program case manager and Bi-polar Group leader Melissa Jordan last Friday morning. This worker found that [Mother] had attended approximately two of the 14 to 15 bi-polar group sessions that were available to her since she engaged the program at the Mental Health and Substance Abuse Center of Southern Oklahoma. Melissa also shared that she believed her attendance at the anger management program was the same. Additionally [Mother] had recently been dismissed by her psychiatrist for failing to take her prescribed medication as prescribed by her doctor, and for failing to meet with this doctor in person. She has been accessing the services at the Southern Oklahoma Center as an indigent but at the same time has been paying a psychiatrist who practices here on Maui and in Beverley [sic] Hills, for sessions and to also prescribe medication. It should be noted that this psychiatrist, Dr. Dan Asimus, has not seen [Mother] in over a year.

> This worker subsequently spoke with Vince Windham, the federal probation officer assigned to [Mother]. Mr. Windham himself had also just recently become aware of the same information as this worker. He was quite unsatisfied by [Mother's] level of engagement. He shared that he was going to terminate her association with her present provider and force her to participate in the government's purchase of service providers in Oklahoma City, where he said he would know within an hour should she not make an assigned session.

> This worker has filed the information received from the Southern Oklahoma program, including the most recent psychiatrist's notes. In conversing with Ms. Jordan she agreed with this worker that [Mother] has not engaged in treatment in any meaningful way and has most assuredly not stabilized on medication nor been under the direct care of a psychiatrist through their program. She agreed that the children's welfare was most important and that [Mother] needed to make the proper effort and progress before contact of any kind should be afforded her with the children. She said that [Mother] believes the services she is required to do are a punishment to her and not there to help her gain clarity about her life.

This report was written shortly before the Family Court approved the 4/15/08 plan. Based on the information provided in the report and lack of evidence in the record on appeal that Mother expressed any dissatisfaction with the amount or quality of services she was receiving in Oklahoma subsequent to the filing of the report, it appears that Mother continued to receive services such as psychological counseling, anger management, and psychiatric treatment while in Oklahoma. It further appears that any alleged lack of specificity in the 4/15/08 plan is attributable to Mother's absence from the state and participation in services in Oklahoma. Given the foregoing, the 4/15/08 plan does not violate HRS § 587-26.

Mother argues that DHS violated HRS §§ 587-40 and 587-71(f) by failing to provide her with a new or updated plan after the Family Court ordered the 4/15/08 plan. The court ordered the 4/15/08 plan and continued it up until the court terminated Mother's parental rights.

HRS § 587-40(b)(2)(A) (Supp. 2006) provides in relevant part that a DHS report "shall . . . recommend as to whether the court should order . . . a revision to the existing service plan[.]" HRS § 587-71(f) (Supp. 2006) provides in relevant part that "the court shall order in every case that the authorized agency make every reasonable effort, pursuant to section 587-40, to prepare a written service plan, as set forth in section 587-26." Further, HRS § 587-72(b)(5) (Supp. 2006) provides that upon each review hearing, the family court shall "[o]rder revisions to the existing service plan, . . . as the court, upon a hearing that the court deems to be appropriate, determines to be in the best interests of the child[.]"

Mother claims that, at a May 5, 2009 review hearing, her counsel objected to DHS's failure to provide her with a plan after April 15, 2008. At the hearing, however, the court asked Mother's attorney if he objected to a plan being proposed for the

father of Children, and Mother's counsel responded: "There is no service plan for my client, so I haven't -- I don't think I have even seen [the father's]." Counsel's statement does not amount to an objection.

In "Mother's Objections to [Report] Dated July 7, 2009" filed August 18, 2009, Mother disputed various items stated in the July 7, 2009 report, asked that Children be returned to her care or the care of their father or another relative, and challenged the adequacy of the telephonic visitation between Mother and the Children. In closing, Mother requested "that this court consider returning Children to her care in Oklahoma with an appropriate Family Service Plan and with a request that the State of Oklahoma provide courtesy supervision." This request, however, does not amount to an assertion that the 4/15/08 plan was inadequate or should be replaced or updated.

Based on our review of the record on appeal, Mother's counsel did not raise the issue of the absence of a new or updated plan until the permanent plan hearing on July 2, 2010. At the hearing, on cross-examination, Mother's case manager testified that DHS had not issued Mother a plan since April 15, 2008 because DHS had "been in an extended holding pattern in regard to order to show cause hearings and permanent plan hearings for almost a year now[.]" He added that "at some point in this case we pretty much abandoned the goal of reunification with the mother and we focused on the father." The case manager testified that had he prepared an updated or new plan for Mother, it would probably have contained therapeutic intervention, appropriate medical management, and anger management; the same services she had been provided through federal probation and failed to complete. The GAL testified that after Mother returned to Maui, DHS did not provide Mother with a plan and "did nothing to assist her"; however, the GAL also opined that Mother did not demonstrate sufficient stability to reunify with the Children at

that time or in the reasonable future and that it would be in the Children's best interests to be permanently placed with the current foster parents. Mother testified that she contacted DHS for services after she returned to Maui, but did not request anger management or medical monitoring because she was still on federal probation and she worked "with them on that."

Mother did not timely make a claim for additional or different services. See In re Doe, 100 Hawai'i 335, 344, 60 P.3d 285, 295 (2002). Given her failure to do so, she cannot now fault DHS or the family court for not providing her with a new or updated plan. See also In re Doe, 99 Hawai'i 522, 537, 57 P.3d 447, 462 (2002) (holding that failure to object amounts to a waiver of claim on appeal).

We conclude that DHS did not violate HRS §§ 587-26, 587-40, or 587-71(f), and FOFs 62, and 77-79 are not clearly erroneous.

(2) Mother argues that the evidence was insufficient to support the Family Court's conclusion that DHS had made reasonable efforts to reunite her with Children and she was unwilling and unable to provide a safe family home, even with the assistance of a service plan, where DHS did not provide her with reasonable visitation. Mother contends that "[i]t is unconscionable for the Family Court to find that Mother had weekly supervised visitation with her children when the record so clearly states otherwise." She challenges the following (underscored) parts of FOFs 47 and 79 as clearly erroneous:

> 47. [Children] had weekly supervised phone contact with [Mother] when [Mother] was in Oklahoma. These contacts became more stressful for the children and they are becoming more and more resistant to participating.
> . . . .
>
> 79. The DHS treated Mother and Father fairly and serviced the entire family intensely since the start of the instant DHS and Family Court intervention subject to Father's voluntary absenteeism at the onset of the case and Mother's unauthorized flight from the jurisdiction and subsequent relocation(s).

On November 16, 2007, Mother moved for an order providing for contact between her and Children. In an attached declaration, her counsel stated that her case manager would not allow any contact whatsoever between Mother and Children. He claimed that Mother had not been able to contact Children, but was told she could send them letters and packages, which the case manager would review before they were passed on.

On December 6, 2007, DHS filed a report, stating that Mother was in Oklahoma awaiting sentencing in her Interference case; requesting that the Family Court defer a plan from DHS until after Mother's sentencing, so DHS could see whether she would be incarcerated and what recommendations the court in that case might make; and recommending continued foster custody until further evaluations could be completed. On January 11 and 29, 2008 and March 10, 2008, the court continued foster custody and a 5/29/07 service plan.

DHS filed the 4/8/08 report, recommending that the Family Court approve and order the 4/15/08 plan and prohibit Mother from having any phone or physical contact with Children until she was engaged in treatment and was on medication and stable. The Family Court ordered the 4/15/08 plan.

At a May 6, 2008 hearing, the case manager stated that he was working to provide Mother with phone visitation with Children that would be supervised by Children's therapist and conducted during therapy sessions. The court ordered telephone visitation, and Mother's counsel stated that he had no objection to the plan.

The record on appeal shows that there was a time when Mother did not have telephone contact with Children because DHS and the court determined that it was impracticable to order it, but she had regular, weekly telephone contact with Children after May 6, 2008.

Mother argues that the court should not have found that she was provided with weekly visitation or that DHS treated her fairly and serviced the entire family intensely, where the court erroneously denied her June 30, 2008 motion for transfer or and contact with Children and her July 28, 2008 motion for supervised visits and a finding of no reasonable efforts.

On June 30, 2008, Mother filed the motion to transfer Children to Oklahoma, and in an attached declaration her attorney stated the following:  Mother was on probation and could not leave the jurisdiction, and she was told she could not transfer to Maui to be with Children, in part because the DHS case manager had opposed it on the basis that she could not see Children until she was stable for nine to twelve months first.  The court held a hearing, at which Mother's counsel admitted that in requesting personal contact with Children, Mother was seeking an "extraordinary remedy," but she was just trying to find a way to get her probation transferred to Maui.  Mother's counsel stated that reunification was not possible with Mother in Oklahoma and Children on Maui.  The court denied the motion.

On July 28, 2008, Mother filed a motion for supervised visitation and for a finding of no reasonable efforts.  In an attached declaration, Mother's attorney stated that Mother's probation officer would consider transferring her to Maui if she could have supervised visitation with Children there, but the DHS case manager refused to allow it.  The court denied the motion, and stated if Mother returned to Hawai'i, the court might reconsider her motion for supervised visits.

The Family Court did not abuse its discretion in denying supervised visitation after considering evidence that impacted upon the issue, including that Mother had not been complying with services in Oklahoma and had been denied a probation transfer on the basis that the case manager had made nine to twelve months of stability a condition of supervised

visitation. <u>See</u> <u>In re Doe</u>, 109 Hawai'i 399, 411, 126 P.3d 1086, 1098 (2006) (citations omitted) ("[w]here the best interests of a child is of paramount importance, consideration of all relevant evidence becomes a critical duty of the court in making a decision regarding . . . visitation"); <u>see</u> <u>also</u> HRS §§ 587-63(c)(2), 587-71(m), & 587-72(b)(6) (Supp. 2006). The record supports the Family Court's determination that continued visitation would not be in Children's best interests.

Accordingly, we conclude that FOF 47 and 79 are not clearly erroneous. The Family Court did not clearly err in concluding that Mother was unable and unwilling and would not in the reasonably foreseeable future become able or willing to provide Children with a safe family home within a reasonable period of time, even with the assistance of a service plan. COL 8 is not wrong.

For these reasons, the Family Court's August 25, 2010 decision, entitled Findings of Fact, Conclusions of Law, and Order, is affirmed.

DATED: Honolulu, Hawai'i, August 31, 2011.

On the briefs:

Meg Obenauf
(Obenauf Law Group)
for Mother-Appellant

Patrick A. Pascual
Mary Anne Magnier
Deputy Attorneys General
for Petitioner-Appellee

Chief Judge

Associate Judge

Associate Judge